We will hear argument next in No. 24-1198, Lobo against Department of Justice. Mr. Collins. Thank you, Your Honor. May it please the Court, my name is Brian Collins. I don't speak very often, so I'm nervous. I guess I want to try to ask you about some things that are at least important at the moment in my thinking. One just factual thing, two different jail or detention centers are mentioned in the record. Which one was your client working at in and around January of 2010 when he first became ill? Both. Both, okay. Okay, so now I'm just going to use the plural and call them jails, even though one is called a detention center. I do have an important factual question I want to get an answer to. Pretty early in getting into this case, the question that occurred to me, why don't we have the health records from the jail centers, not Mr. Lobo's health records, the overall population health records. It would seem on its face to make a, to be highly relevant to answering the only question here, which is where did this bacteria, where did he get the pneumonia, to know whether, for example, others in the two jails at the relevant time are recorded in the jails records as having pneumonia or not. I look at the statute and section 10288 directs the bureau to expeditiously attempt to obtain the information and documentation necessary, which feels like it might be very, very important, including subpoenas to third parties like public agencies. So I just, just as a factual matter for the moment, I want to understand, did either you or the government try to get this information and met with no success, or did nobody try, or what? This is very much on my mind. Well, I don't want to say we didn't try, but we didn't try. We didn't get that information because it's not collected. What is collected?  The jail doesn't keep records of illnesses in its facility? When, this is a highly trans-supported jail. They have 90 beds, but they rotate people in and out all day long in many different shifts because of overcrowding in the California prison system, convicts have been released back to their local jails. So they have those prison population in the jail. Is this the case for both jails? Yes. They also, well, I'm not sure about the one jail's population. The other jail has 90 beds, but they rotate people. But I imagine in terms of rotating in and out all day long, no one stays there for more than a couple of days?  Both of them are like that? They put them on buses and drive them around the county because of the overcrowding situation. Getting back to your question, there is a nurse who does an intake on people coming in, but it's simple. Are you injured? Yes or no? What's your injury? Whatever it is, she notes it. The other question, do you have tuberculosis? That's it. So no, we didn't reach in and try to find these records. I'm not sure they'd be available to us. But they seem to be. I mean, it seems from the statute that they would be available to the Justice Department if only by subpoena. It could be. It could be. OK, so the issues that you raise here, there's obviously no dispute about, you know, severe total disability from the pneumonia. And the only question, but it is an essential question, is where did the pneumonia come from, whether it was at work or from somewhere else? And do I understand the record right to be basically this? Your expert, Dr. Hyman, says more likely than not, it came from the jail. And the government's two experts, Mr. Etgen and Dr. Diaz, or maybe they're both doctors, right? Dr. Diaz and Etgen said, I don't know. They didn't actually say, I think it's more likely that it came from outside the jails. They said, don't know, with at least Dr. Diaz saying these particular jails were not overcrowded. And so at least the literature on overcrowded jails as being, you know, unusually bad petri dishes doesn't apply here. Is that kind of the state of the record? I'll agree with you because you're right. Dr. Etgen, his report is a preliminary report. Three times he says it's preliminary. It's a page and a half long. There's over 10,000 pages of records on this particular case. His report doesn't review any of Dr. Hyman's reports, doesn't review anything from the San Bernardino County Employee Retirement Association, Disability Retirement, the WCAB stipulation, but he didn't review any of that. But he did say his file was devoid of information, which would indicate it was industrial. Well, all of those documents indicate it is industrial. So either he didn't review them or he didn't get those records. And it is a preliminary, not a final report. Right. But on the question of origin in the jail, I guess my recollection is this, that the various legal conclusions that were drawn under a California regime in which by statute pneumonia is presumed for people like your client, Felice and others, to come from from work. And so no independent determination of causation on that point needed to be made. And so one has to look down to the next level of the actual evidence on the point. And that, I guess I'm remembering and you correct me if I'm wrong, comes down to Dr. Hyman's assessment from referring not just to overcrowding studies, but other medical literature, which we have not been given in the joint appendix about prisons and other prison like facilities like jails being higher risk than, for example, the outpatient clinics where I guess Mr. Lobo went two times between January and the April 2010 hospitalization. Correct. Much of what Dr. Hyman wrote about is that in the prison setting, as a jailor, he has to have contact with certain prisoners on a regular basis. People come in looking for a fight. People come in at the worst moments. They have to be directed physically. That's physical contact that's going to get you in contact with somebody that has pneumonia. Many people have the pneumonia bacteria, but they don't know it. Their symptoms are relatively mild. I mean, you know, COVID, you've had people affected by COVID. People die from COVID. So Dr. Hyman referred, if I remember right, to he cited four pieces of medical literature. I forget exactly where that is in the appendix. Actually, I don't know where it is. Page 585, 585 of the appendix. His evidence log lists article infection control in jails and prisons from 2015. Overcrowding leads to pneumonia in 1994. Overcrowding forces jails to release inmates. 2011 and prisons as incubators and spreaders of disease from 2007. We haven't been given those articles. Two of them, at least by title, are about overcrowding. And so and we don't really know here that these jails were overcrowded. I think Dr. Hyman said in his deposition that the literature is not limited to overcrowded facilities, but prisons and jails more generally. What, if anything, can you tell us about that literature? Well, the reason I mention this, Dr. Diaz in his report concentrated, I mean, actually not concentrated, addressed only the overcrowding issue and said, well, there would be less of a risk if a jail was not overcrowded, full stop, without saying, well, is there still more of a risk than going to the urgent care clinic? He never says anything about that. Dr. Diaz says essentially it was an equal likelihood that he would have had the exposure in the jail as in the general public. I'm not, can you say, I'm not actually sure he said that. And I was, I mean, literally I'm not sure. I know the government says he said that. I couldn't quite pinpoint it, but the part of his report where he used the language of APARC, where he used the language of equal likelihood, was equal likelihood between aspiration and inhalation, which I did not understand to be the same as in the jail or out in the wilds. Let me see if I can find it. Well, Dr. Diaz is, I guess what I'm thinking of is on page 626, I think. Right. Equally at likely risk of acquiring severe S-pneumonia cap by either aspiration or inhalation. His cap condition may not have been 100% industrially related by, as asserted by Dr. Honey.  But I don't see where he said, though I think the government suggests that he said, and so I'd like to find it if it's, if he did say it, that it was, that he thought it was equally likely, equally likely that Mr. Lobo got this from the jails or from somewhere outside the jails. That would be on 623.  Fourth paragraph, Dean. Therefore, Mr. Lobo could have been exposed to S-pneumonia either by contact with infected asymptomatic inmates at the jail facilities or by contact with infected patients, especially children and adolescents.  I'm just, I mean, this at least is, I think, helpful to you. This does not say that it's equally likely. He just said it could have happened either place. Yes. And he used could have or may have, I don't know, half a dozen times throughout his report. He did. He did. It's, you've got Dr. Olgin saying his file's devoid of evidence. There's no foundation for his opinion. You've got Dr. Diaz saying maybe it's industrial, maybe it's not. You've got Dr. Hyman saying this is work-related, this is due to the industrial environment. And I know you mentioned California, Labor Code 3212. There is a presumption that if an officer gets pneumonia, that it is in the course and scope of the employment. However, that was never raised in this case because he had so many additional problems. Okay. Well, why don't you save the remainder of your time for rebuttal and we'll hear from the government. Thank you very much. Thank you. I can't believe how many different cases you guys hear. This is great. May it please the Court. The Court should affirm the decision of the Bureau of Justice Assistance because substantial evidence supports the Bureau's decision that Mr. Lobo did not establish the proximate cause of the injury that was incurred in the line of duty. And that's really the heart of the issue here, Your Honor, as you stated at the outset. Can you talk about where I started with why it is we don't have any information about the health condition of the population of the two jails during the relevant period, which would seem to be so relevant? My understanding, Your Honor, is that that provision that you referenced in 2017, it was enacted. And it puts the burden on the Bureau if they're unable to adjudicate the claim. And in this instance, they're able to look at the entire record, including opinions from three different medical experts to say, based on the type of bacterial pneumonia that Mr. Lobo had, we can't say one way or another where this originated from. Right. But there's certainly some, I don't know, general APA law. There's a line in Supreme Court decision FCC against Fox Television that says, sometimes it can be arbitrary and capricious for an agency not to go and get easily obtainable information. And we have a record in which, as I think your brief kind of implicitly recognizes, it feels like it's very important to know what the general health conditions in these two jails are at the time. Because you stress early in the brief and several times later, there is no evidence that there was a problem there. Well, there's also no evidence that there wasn't a problem there. And it feels, therefore, as though whether there was a problem there is pretty important. And what is your understanding of whether such information might, in fact, be available? I assume, first of all, you didn't seek to use this authority or otherwise seek to ask the San Bernardino County, whoever runs these jails, for such information. No, it's my understanding that the agency below did not request that documentation from the county. Mr. Lobo did testify at the hearing before the administrative judge. He was at these facilities and he testified that he was unaware of any pneumonia that was at that facility. So you're saying that he would – it's your view that records aren't necessary because he testified that he wasn't aware? Well, I think there's evidence in the record that an employee that was at the facility is saying that they're not aware of it. Is that in the joint appendix, not just the record, but in what we've been given? It is, Your Honor. Did the bureau rely on that? I'm sorry. Did the adjudicator, the hearing officer, rely on that? In finding that there was no – In finding that there was no way to know one way or the other whether – where he caught the pneumonia. No, that was taken into account by the hearing officer and the bureau in regard to – more so in regard to the discussion on Dr. Hyman and these literature articles that he discusses saying that there's an increased likelihood of incurring pneumonia at a jail because of certain conditions. And the analysis and the opinions really go to, on that factual basis, that there wasn't any evidence that there was overcrowding or there was – or pneumonia in these facilities. But there is no evidence on it at all, right? I mean, that goes back to Judge Taranto's point, which is in a circumstance like that, is it under the statute, is there some sort of duty to at least make the inquiry? Well, and I guess the position I'm setting forth is that there was some evidence on the record from someone from that facility saying the negative, that there's nothing there. Can you just give me the JA page where that would appear? And you said that this is from Mr. Lobo himself. Mr. Lobo. I believe it is on page 232. Oh, you know what, Your Honor? I'm sorry. It is – I believe I misstated it. It is Dr. Hyman's characterization of his conversations with Mr. Lobo. At this page? No. I led you to the wrong page, Your Honor. I apologize. So there is no testimony to that effect? Yes. I stand corrected, Your Honor. Okay. I would point, Your Honor, to the fact that it is also the burden is on Mr. Lobo. Right. Of course that's true, but Congress didn't add 102-88 for no reason. I mean, it almost seems designed for a case like this, that you can actually subpoena the public agency. I mean, I may be overstating and say designed for this purpose, obviously, to get information about the individual, which maybe the public agency has. But for something like this, information from the public agency about the population, if you're trying to figure out did somebody get a particular disease at a gathering, at the inaugural ball or something, it's really relevant to know whether in the week afterwards a whole bunch of people reported sick. I agree that could add to the relevancy, Your Honor. But even still, if there was just evidence that there had been a case of pneumonia or there had been pneumonia in the facility, that would be something the Bureau would take into consideration. But it would also – that's not to say that that would necessarily lead to a direct and proximate cause. It would still have to show that Mr. Lovo came into contact with this pneumonia. So I would direct the Court's attention to the Malin case, M-A-L-I-N case, in which an employee who was working in agriculture got cancer. And there was evidence that there was toxins in the soil that could lead to cancer or aggravate cancer. And this Court affirmed the Bureau's decision to say just an increased risk that is in the workplace does not necessarily lead to a direct and proximate cause of the injury. Right. I mean, I think – right, does not necessarily, right? But we have a record, right, in which of the three experts, one says I think it's more likely the other two say who knows. And I assume that the decision-maker here recognized the difficulty of the judgment that had to be made. Are we going to say, well, we ultimately don't really credit Dr. Hyman's testimony? He's the only one who actually expressed an opinion of which was more likely than not. And that leaves us in the place of uncertainty. Wouldn't it possibly make a difference to the fact-finder if there was actual information about, you know, pneumonia or related sickness in the facilities where Mr. Lobo was working? I agree. I mean, that it could make a difference. It could make a difference, Your Honor. That information was not before the Board. That was not raised as an issue before this Court. And so I don't have any information in the record as to what extent, if that was requested and there was negative information. All we have before us is that there's no evidence in the record as to when, where, or how this injury was incurred. Well, I mean, the evidence in the record was the report that says it likely came from the person. So, Your Honor, one of three medical opinions say that there's a higher likelihood. And then when you peel that back, he's relying on several academic literature articles that have these aggravating circumstances like overcrowding, like an AIDS epidemic, other aggravating factors, and that's not what we have in this case. We have no facts that are analogous to the conditions in the Fed academic literature to say that there's an increased likelihood. But then I would again point the Court to the Moon case, where it says even if there is a higher likelihood, that still does not – that's still not substantial evidence of approximate cause. Or otherwise – It's still not necessarily persuasive evidence. Yes, Your Honor. Or stated otherwise, this Court can look at the decision of the Bureau, the 24-page decision in which they considered all this evidence and found that substantial evidence did not support this finding of approximate cause. And just to be – first, I guess I want to ask two sort of focused things. We were talking before, I think, about did somebody say that there was no evidence of pneumonia. If you look at page 624, this is in Dr. Diaz's opinion, there's a table. And if you go down to the second-to-last item, and I want you to kind of actually explain who wrote what words here in this table, it says, I am not aware of other inmates or staff being diagnosed with pneumonia during my assignment at the Victor Valley Jail. And it refers to something on April 4th, 2017, page 16, lines 18 to 25. That appears to be what would be appendix page 229, but – which is – this is all part of – what is this document? A hearing. This is the hearing before DOJ. But 229 is not in the joint appendix. There's a gap between 216 and 231. And this is Mr. Lobo. I believe there were three individuals in the record, and you're right, Your Honor, those pages are not before the courts, just summarized by Dr. Diaz. I believe Dr. Hyman summarized Mr. Lobo's statements that he was not aware of any other inmates. There was one colleague from the jail who testified, and I believe he also was unaware of any cases of pneumonia in the prison – or the jail during that timeframe. So I believe that's the two sources of that information. I should say three because it's Hyman summarizing Mr. Lobo and then the colleague.  But you are correct, Your Honor. And the little thing was something I discussed with Mr. Collins. So on page 9 of your brief, you describe Dr. Diaz as, quote, finding it equally likely that he was exposed, he being Mr. Lobo, at the jail or in other settings citing pages 623 to 624. Where on those pages does he say that? I don't think he – anyway, I can't find him saying that. The equally likely language is the language we discussed with Mr. Collins about the equally likely aspiration or inhalation, not jail, no jail. Yes, Your Honor. I think that was our characterization. Okay. Okay. That there's two types – there's two – aspiration or inhalation. And aspiration, you know, meaning that it colonizes the nasal pathways and it could be dormant for an indefinite period of time, so it could have been incurred anywhere. And inhalation is down through the lungs. Yes, Your Honor. And so I believe he makes that distinction just to say that, again, based on the type of pneumonia he had, there's no way to determine when, where, or how he got the – But am I right that he never says, I don't know, that that distinction between aspiration and inhalation somehow distinguishes jail versus outside of jail exposures? No, he doesn't say one is more likely than the other. Okay. I see I'm about out of time, Your Honor. If there's no other questions, I'll briefly conclude. Okay. Thank you. Your Honors, I have no rebuttal, but if you have additional questions, maybe I can help. I think we're good. Thank you. Thanks to both counsel. The case is submitted.